**NORTHERN ASSURANCE COMPANY OF AMERICA, Plaintiff/Counter-Defendant/Appellee,**

v.

**William J. SUMMERS, Defendant/Appellant,**

and

**Connie Lark and William D. Lark, Defendants/Counter-Plaintiffs/Appellants.**

No. 93–1917.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 1, 1993.

Decided Feb. 22, 1994.

---

Timothy J. Hulett (argued), Michael V. Gooch, Douglas A. Tresslar, Harrison & Moberly, Indianapolis, IN, for plaintiff-appellee.

Robert F. Hunt (argued), Eric A. Frey, Frey, Hunt, Hassler & Lorenz, Terre Haute, IN, for defendant-appellant.

Before POSNER, Chief Judge, and WOOD, Jr. and MANION, Circuit Judges.

MANION, Circuit Judge.

Northern Assurance Company of America ("Northern Assurance") filed a declaratory judgment action against Connie Lark ("Connie"), William Lark ("William"), Barbara Nash ("Nash"), William Summers ("Summers") and the Sycamore Agency, Inc. ("Sycamore"). Northern Assurance sought a declaration that it did not provide coverage for an automobile accident occurring on July 20, 1991 involving William and Summers. Connie and William counterclaimed, alleging breach of an insurance contract and bad faith handling of an insurance claim. Northern Assurance then counterclaimed against Connie and William seeking reimbursement for any amount it was required to pay Summers. The district court determined that no coverage existed, entered a judgment in favor of Northern Assurance on Connie and William's counterclaim, and dismissed as moot Northern Assurance's counterclaim against Connie and William. Connie, William and Summers appeal. We affirm.

## I. Facts

Sycamore is an insurance agency representing several insurance companies, including Northern Assurance. Under a formal agency agreement, Sycamore is an agent for Northern Assurance, with authority to receive and accept personal and commercial lines of insurance, subject to certain restrictions. Nash works for Sycamore as a customer service representative, acting as an intermediator between Sycamore's clients and the insurance companies. This includes finding insurance companies that are willing to provide insurance for her clients. Connie and her son William, who lives with Connie, are two of Nash's clients. Nash originally obtained automobile insurance for Connie from Amerisure Insurance Company. That policy, however, lapsed in April or May of 1991. In June of 1991, Nash issued an insurance binder to provide temporary coverage for Connie and William with Pafco Insurance Company. Pafco's binder, like that of other insurers, is a temporary insurance contract which covers automobile accidents which may occur while an application is being completed and submitted to the insurer. In this case,

after Nash issued the insurance binder, she determined that Pafco would not accept the risk of insuring William because a motor vehicle report revealed that he had numerous speeding tickets, as well as a ticket for driving while intoxicated. Therefore, Nash never submitted an insurance application to Pafco.

After determining that Pafco would not insure William, Nash and Connie discussed the possibility of obtaining insurance from Northern Assurance. Northern Assurance is a premium insurance company, and as such will only insure low risk individuals who meet certain requirements. Northern Assurance sets forth the specific criteria it uses to determine acceptable risks in its Personal Auto Acceptance Standards. The Standards provide in part that in order to qualify for any Northern Assurance insurance, the named insured must be: "(1) Currently insured for Automobile liability coverage by a standard carrier; (2) Willing to let the company underwrite all automobile exposures in the household." The Standards further provide that:

risks having one or more of the following characteristics usually will not qualify. Although risks may be submitted for consideration.

COVERAGE MAY NOT BE BOUND!!!

A. ANY DRIVER:

  *  *  *  *  *  *

2. Has had insurance canceled, non-renewed or declined during the last three years.

  *  *  *  *  *  *

4. Has had any of the following major violations in the past 5 years.

  a. driving under the influence of alcohol or drugs.

  *  *  *  *  *  *

15. Estranged, separated or divorced within the past year.

At the time that Nash and Connie discussed obtaining insurance from Northern Assurance, Connie was not insured. Additionally, all members of Connie's household would not be insured under the policy because Connie and Nash decided not to ar-

range for Northern Assurance to cover William, apparently because they now believed that he was covered under his father's automobile insurance. Connie's insurance had also lapsed within the last three years and she had been separated and divorced within the past year. Moreover, William had received a ticket for driving while intoxicated. Despite these facts and the conflict with the above Standards, Nash offered to have Sycamore bind coverage for Connie and to submit an application to Northern Assurance.

On July 5, 1991, Nash mailed the application binder to Connie. Connie did not sign or return the application until July 22, 1991. In the interim, however, on July 20, 1991, William, while driving Connie's car, was involved in an accident with a car driven by Summers. William was intoxicated at the time of the accident; Summers was injured. On the following Monday morning, July 22, 1991, Connie called Nash and told her about the accident. Nash asked Connie if she still had the insurance application, to which Connie responded that she had. Nash told Connie to "[g]et the [application] into the office just as quickly as possible." Connie was unable to get to Sycamore during business hours, however, so she arranged to meet Nash after hours in the parking lot, at which time she gave Connie the signed application, along with a one hundred and fifty dollar premium deposit.

The next day, Nash discussed the situation with her supervisor. She learned from her supervisor that Northern Assurance required Sycamore to notify it within five working days that it had issued a binder. Because the binder was issued on July 5, 1991 and Nash had still not notified Northern Assurance of its existence, she and her supervisor decided it would be best to change the date on the binder to July 15, 1991. Nash then submitted the application/binder, dated July 15, 1991, to Northern Assurance on July 23, 1991. In submitting the binder and application, Nash did not notify Northern Assurance that Connie's automobile had just been involved in an accident. The binder/application also failed to list the recent accident under the "Accidents, Convictions & Losses" sec-

tion of the application, instead noting that "none" had occurred.

Based on the application Nash submitted, Northern Assurance issued an automobile policy to Connie on July 24, 1991 with a retroactive effective date of July 15, 1991. On the same day, Connie, through Nash, filed a claim with Northern Assurance for the July 20, 1991 accident. Northern Assurance originally paid Connie $6,250 for damage to her car. After learning of the circumstances surrounding the issuance of the binder and the policy, however, Northern Assurance denied coverage.

By this time, Summers had filed a personal injury action against William. William and Summers eventually entered into a settlement agreement, under which they submitted an Agreed Judgment against William in the amount of $1,000,000. The settlement further provided that Summers would not enforce the Agreed Judgment in exchange for William and Connie's assignment to Summers of any rights and interests they might have against Northern Assurance.

Northern Assurance filed a declaratory judgment action against Connie, William, Nash, Summers and Sycamore. Northern Assurance sought a declaration that no coverage existed for the July 20, 1991 accident. Connie and William counterclaimed, alleging breach of an insurance contract and bad faith handling of an insurance claim. Northern Assurance then counterclaimed against Connie and William seeking reimbursement for any amount it was required to pay Summers. William, Connie and Summers filed a Motion for Partial Summary Judgment, asking the court to enter judgment in their favor on Northern Assurance's Amended Complaint for Declaratory Judgment. Northern Assurance filed its own Motion for Summary Judgment, asking the Court to enter judgment in its favor on the Amended Complaint for Declaratory Judgment and on the Counterclaim against it. The district court granted Northern Assurance's Motion for Summary Judgment, denied Connie, William and Summers' Motion for Partial Summary Judgment, finding that no coverage existed for the July 20, 1991 accident, —— F.Supp. ——. The court also entered a judgment in favor of

Northern Assurance on Connie and William's counterclaim and dismissed as moot Northern Assurance's counterclaim. Connie, William and Summers appeal.

## II. Analysis

■ Summary judgment may be granted only if there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). We review a district court's granting of a summary judgment motion *de novo*. *Caldwell v. City of Elwood, Inc.*, 959 F.2d 670, 671 (7th Cir.1992). Applying these principles, we must determine whether coverage exists for the July 20, 1991 accident. Indiana law governs our determination. Coverage potentially exists under either the binder Nash issued on July 5, 1991 (subsequently altered to read July 15) or under the insurance policy Northern Assurance issued on July 24, 1991, with a retroactive effective date of July 15, 1991. Each will be discussed in turn below.

■ As a preliminary matter, however, we consider the appellants' argument that Northern Assurance is estopped from denying coverage or avoiding the policy because it retained Connie's one hundred and fifty dollar premium deposit. The appellants are correct that the general law of Indiana is that an insurer is estopped from denying liability if it retains an insurance premium after learning that the policy is void. *Hitt v. Githens*, 509 N.E.2d 210, 212 (Ind.App.1987); *Security Underwriter's, Inc. v. Long*, 168 N.E. 699 (Ind.App.1929). Before Northern Assurance learned of the misrepresentations, however, it paid Connie $6,250 for the damage to her car. Since Northern Assurance already paid Connie $6,250 (to which she was not entitled) it is obviously not required to return an additional $150. Accordingly, we hold that Northern Assurance is not estopped from denying liability for the personal injury claim.

Appellants respond by arguing that Northern Assurance may attempt to recover the entire $6,250 from Connie in the future and, therefore, Connie is at risk of losing the premium. If Northern Assurance does pursue such a claim in the future and is successful, Connie should be given credit for the $150 premium she paid.

### A. The Binder

■ Returning to the main area of contention, we first consider whether Northern Assurance is liable for the July 20, 1991 accident under the binder Nash, through Sycamore,[1] issued to Connie on July 5, 1991.[2] While it is undisputed that Nash issued this binder, whether Northern Assurance is actually responsible for these actions is another question—one which rests on an application of agency principles. "The general rule regarding a principal's liability to third persons for the acts of his agent, as regards contractual (non-tort) liability, rests upon the determination of whether the acts of the agent were committed in the principal's behalf and within the actual or apparent scope of the agent's authority." *Clark v. Millikin Mortg. Co.*, 495 N.E.2d 544, 547 (Ind.App.1986). A principal is not bound when agent acts outside its authority in executing a contract purportedly on the principal's behalf. *Allegheny Mutual Casualty Co. v. Franklin*, 513 N.E.2d 658, 659 (Ind.App.1987). Thus, Northern Assurance is only bound by Nash's issuance of the binder, if Nash had either actual or apparent authority to enter into this contract on Northern Assurance's behalf.

### 1. Actual authority.

■ Actual authority is that authority that a principal gives, either expressly or impliedly, to his agent. *Indiana Dept. of Pub. Welfare v. Chair Lance Serv., Inc.*, 523 N.E.2d 1373, 1377 (Ind.1988). Northern Assurance's written agency agreement with Sycamore set forth Sycamore's actual authority, as follows:

1. Nash, as Sycamore's agent, was also acting on behalf of Sycamore. Therefore, for simplicity's sake, we will refer to Nash's actions as her own, but her actions are equally Sycamore's.

2. After the accident occurred, the original date on the binder was changed to July 15, 1991. For purposes of our decision, it is irrelevant that the date on the binder was altered, although this exemplifies the incongruity of Nash and Sycamore's actions toward Northern Assurance.

2. AUTHORITY. Agent shall have the authority to receive and accept proposals for contracts of personal line and commercial lines insurance (as defined by Company) as Company and Agent have authority lawfully to make; subject, however, to the restrictions placed upon Agent by the laws of the state or states in which Agent is authorized to write business, to the terms and conditions set forth herein, and to such general and specific instructions, authorizations, restrictions and criteria as may from time to time be given to Agent by Company in writing.

As set forth above, Northern Assurance's Personal Auto Acceptance Standards set out specific instructions and underwriting criteria. *See supra* 3. Under these standards, Connie did not qualify for insurance because she was not currently insured for automobile liability coverage by a standard carrier and because she was not willing to let Northern Assurance insure William (not only because he obviously would not qualify but also because she assumed he was under his father's coverage). The Standards further specified that Nash could not bind coverage for Connie because her insurance had lapsed within the last three years and because she was separated and divorced within the last year.

The appellants do not dispute that Connie did not satisfy Northern Assurance's underwriting guidelines. Rather, they direct our attention to the expression of authority which required the standards to be "given to Agent by Company in writing" and argue that if the Standards were not provided in writing to Sycamore, they would not become incorporated into Northern Assurance's statement of authority. They then assert that a genuine issue of material fact exists as to whether Northern Assurance provided the Personal Auto Acceptance Standards in writing to Sycamore.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Whetstine v. Gates Rubber Co.*, 895 F.2d 388, 392 (7th Cir.1990), quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Northern Assurance provided just such documentary evidence to support its position that the underwriting criteria was provided in writing to Sycamore. Specifically, Northern Assurance points to Nash's deposition testimony in which she testified that Northern Assurance's underwriting criteria were contained in Sycamore's office manual.

"Once the movant has made a properly supported motion, the nonmovant has the responsibility of going beyond the pleading and setting forth specific facts demonstrating the existence of a genuine issue of fact for trial." *Whetstine*, 895 F.2d at 392. *See also Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.1983) (stating that "an adverse party responding to a properly made and supported summary judgment motion must set forth specific facts showing that there is a genuine issue for trial"). The appellants have failed to present any evidence that would indicate that Sycamore did not receive the Personal Auto Acceptance Standards. In fact, the appellants do not even state affirmatively that Sycamore did not receive the Standards in writing. Rather, they merely claim that an issue of fact exists as to whether the standards were provided to Sycamore in writing. "[A] bare contention that an issue of fact exists is insufficient to raise a factual issue." *Posey*, 702 F.2d at 105. This bare contention certainly does not overcome Nash's testimony. Accordingly, we reject the appellants' attempt to create a genuine issue of material fact.[3]

---

**3.** Northern Assurance also argues that Nash only had actual authority to issue an insurance binder to provide coverage for five days, unless within those five days she notified Northern Assurance of the existence of the binder. Since Nash issued the binder on July 5, 1991 and did not notify Northern Assurance of its existence within five days, Northern Assurance asserts that Nash's ac-

tual authority only allowed her to bind coverage until July 10, 1991. Thus, Northern Assurance claims that coverage under the binder ended before the accident. We need not decide, however, whether the five-day notice requirement was a limit on Nash's actual authority or merely a contractual obligation between Nash, as the agent, and Northern Assurance, as the principal,

## 2. *Apparent authority.*

 The appellants claim that even if Nash did not have actual authority to issue the binder, she had apparent authority to do so. "In addition to 'actual' authority given an agent by his principal, either expressly or impliedly, Indiana's law has for nearly a century recognized 'apparent' authority." *Riverside Ins. Co. of America v. Smith,* 628 F.2d 1002, 1010 (7th Cir.1980). *See also Bain v. Board of Trustees of Starke Memorial Hosp.,* 550 N.E.2d 106, 109 (Ind.App.1990); *Warner v. Riddell Nat. Bank,* 482 N.E.2d 772, 775 (Ind.App.1985). The Indiana Supreme Court presented the rule concerning apparent authority in *Pepkowski v. Life of Ind. Ins. Co.,* 535 N.E.2d 1164 (Ind.1989).

> Apparent authority is the authority that a third person reasonably believes an agent to possess because of some manifestation from his principal. The necessary manifestation is one made by the principal to a third party, who in turn is instilled with a reasonable belief that another individual is an agent of the principal. It is essential that there be some form of communication direct or indirect, by the principal, which instills a reasonable belief in the mind of the third party. Statements or manifestations made by the agent are not sufficient to create an apparent agency relationship.

*Id.* at 1166–67 (internal citations omitted).

The appellants claim that the *Pepkowski* requisites for apparent authority exist in this situation. They claim that Connie had a reasonable belief that Nash could issue the binder on behalf of Northern Assurance because Northern Assurance gave Nash an insurance binder form which provided that "[t]he Company indicated by the letter in the "CO." box hereby binds insurance in favor of the insured named in item 1." Thus, we direct our attention to the "CO." box. The "CO." box merely contains four letters: A, C, F and N. The box corresponding to the letter N was checked. Even if the N signified Northern Assurance, the "CO." box did not include the name Northern Assurance. In fact, nowhere on the binder form did the name Northern Assurance appear. The only way that Connie would believe that the binder form gave Sycamore authority to bind Northern Assurance would be if Nash told Connie that the N signified Northern Assurance. But this is not sufficient to create apparent authority because the manifestation must come from the principal. Moreover, the binder form did not name Sycamore as its agent; rather, the form contained a blank which Nash filled in with the name "Sycamore Agency." Thus, the form also did not contain any manifestation by Northern Assurance that Sycamore was its agent.

Furthermore, even if the binder included Northern Assurance's name, *Pepkowski,* 535 N.E.2d 1164, demonstrates that this would be insufficient to create apparent authority. In *Pepkowski,* the plaintiff argued that an insurance company gave apparent authority to one of the plaintiff's coworkers, Wytrykus, by supplying Wytrykus with an application and benefits book which bore the company's name. The Supreme Court noted that "the only 'manifestations' by [the insurers was] their permitting Wytrykus to possess their application form and benefits booklet and their accepting the application." *Pepkowski,* 535 N.E.2d at 1167. The court held that "[t]hese acts are not a sufficient manifestation to clothe Wytrykus with apparent authority to bind [the insurer]." *Id.* Thus, *Pepkowski* confirms that the binder form, even if it contained the company's name, was insufficient to create apparent authority in Nash to issue the binder on Northern Assurance's behalf.

 In response, appellants claim that the Indiana public policy proclaimed in *American Underwriters Group, Inc. v. Williamson,* 496 N.E.2d 807 (Ind.App.1986), prohibits Northern Assurance from denying coverage under the binder. In *Williamson,* the court refused to allow an automobile insurer to deny coverage under an insurance policy issued on a fraudulent application. State law required drivers to have insurance so as to protect third parties, and since the insurance policy was in place, albeit due to the in-

because we have concluded that Nash did not have actual authority to issue Connie a binder for

any amount of time.

sured's misrepresentation, public policy required the insurance company, not the injured third party, to bear the loss.

In *Williamson*, however, an insurance contract was issued by the insurance company and in place when the injury occurred, whereas here no contract, not even a temporary one in the form of a binder, was issued because Nash did not have authority to issue the binder. While public policy may be an appropriate rationale in limited circumstances to enforce a voidable contract, we are aware of no case, and the appellants fail to point to any, which uses public policy to create a contract where none existed. Thus, we reject the appellants' argument that public policy and *Williamson* create a binder which provides coverage for the July 20, 1991 accident.

*B. The Policy*

Concluding that no coverage existed under the binder Nash issued, we must now determine whether coverage existed under the automobile policy Northern Assurance issued on July 24, 1991 with a retroactive effective date of July 15, 1991. The district court found that this policy was unenforceable against Northern Assurance because Connie's application contained material misrepresentations. The district court also found that Indiana public policy did not prevent Northern Assurance from voiding the policy. In both respects, we agree.

■ The general rule in Indiana is that an insurance contract is voidable at the election of the insurer if the applicant provides "false answers to questions contained in the application that were material to the risk undertaken by" the insurer. *American Family Mut. Ins. Co. v. Kivela*, 408 N.E.2d 805, 810 (Ind.App.1980). Indiana has modified this general rule in *American Underwriters Group v. Williamson*, 496 N.E.2d 807, to account for the public policy underlying the Indiana Financial Responsibility Act. In *Williamson*, an insurance company issued an automobile policy to Mr. Williamson. In applying for the policy, Mr. Williamson failed to disclose his history of epileptic seizures. Later, after Mr. Williamson was involved in an accident, the insurer sought to rescind the

policy because it was fraudulently issued. The court held that "an insurer cannot on the ground of fraud or misrepresentation retrospectively avoid coverage under a compulsory or financial responsibility law so as to escape liability to a third party." *Id.* at 810-11. The court reasoned that allowing an insurer to avoid coverage would violate the policy of Indiana, as set out in the Indiana Financial Responsibility Act, that operators of motor vehicles in Indiana must have proof of financial responsibility so that persons who suffer loss due to "automobile accidents shall have a source and means of recovery." *Id.* at 810.

This case is distinguishable from *Williamson*. In *Williamson*, the misrepresentation and issuance of the insurance policy occurred before the accident for which coverage was sought. The policy was in force and the certificate of registration (proof of financial responsibility) had been issued. In this case, the misrepresentation and issuance of the policy did not occur until after the accident. This distinction is critical, as the Kansas Supreme Court recognized in an almost identical fact situation in *Slaby v. Cox*, 250 Kan. 429, 827 P.2d 18, 24 (1992). In *Slaby*, the son of the purported insured was involved in an accident at 12:10 a.m. on March 22, 1989. At the time of the accident, the automobile was uninsured. Later that day, the father obtained an insurance binder which provided coverage effective at 12:01 a.m. The Kansas Supreme Court held that the post-accident fraud against the insurance company allowed the insurer to avoid the policy. The *Slaby* Court reached this holding notwithstanding that "it is against [Kansas] public policy to allow insurance companies to renege on the coverage promised as to an innocent injured third party because of an insured's fraudulent acts in obtaining the insurance." *Id.*, 827 P.2d at 24. The court reasoned that the policy of promoting financial responsibility is not furthered by allowing a driver to wait until after an accident to obtain insurance. Rather, "[i]f one can wait to buy insurance until after an accident occurs and thereby gain coverage therefor, it lessens the incentive to comply with the mandatory insurance

law...." *Id.* Moreover, to hold otherwise would promote fraud on insurance companies.

We find the reasoning of *Slaby* persuasive. As an appellate court sitting in diversity, however, we must follow Indiana's resolution of the issue. *Heller Intern. Corp. v. Sharp,* 974 F.2d 850 (7th Cir.1992). No reported case from Indiana has considered the specific issue presented. If state law is undeveloped, we must resort to other persuasive authority to predict how the Indiana Supreme Court would rule. *Sharp,* 974 F.2d at 858. Accordingly, while using *Slaby* as a guideline, we must further analyze Indiana's authority.

The Indiana Supreme Court's exposition in *Transamerica Ins. Co. v. Henry By Henry,* 563 N.E.2d 1265 (Ind.1990), of the public policy underlying the Indiana Financial Responsibility Act further persuades us that Indiana would follow *Slaby.* As the *Transamerica* court explained, "[t]he purpose of our financial responsibility statute is to compel those other motorists to make provisions for our protection." *Id.* at 1268. This policy is not furthered by allowing motorists to obtain coverage after an accident based on a fraudulent application. In fact, "it lessens the incentive to comply with the mandatory insurance law...." *Slaby,* 827 P.2d at 24. Moreover, the Indiana Financial Responsibility Act "does not constitute a social policy to guarantee compensation to all victims of motor vehicle accidents." *Transamerica,* 563 N.E.2d at 1268. These statements convince us that an Indiana court would conclude that its public policy is not offended by allowing National Assurance to void the insurance policy it issued to Connie after the July 20, 1991 accident.

■ We must return then to the question of whether Connie's application contained misrepresentations such that Northern Assurance could void the policy. As stated above, an insurance contract is voidable at the election of the insurer if the applicant provides "false answers to questions contained in the application that were material to the risk undertaken by" the insurer. *American Family Mut. Ins. Co. v. Kivela,* 408 N.E.2d 805, 810 (Ind.App.1980). Connie listed "none" in response to the question asking for "Accidents, Convictions & Losses."[4] This was clearly a false answer, given that an accident had occurred only two days earlier. The question of materiality of a misrepresentation is normally a question of fact. However, if "the evidence is such that there can be no reasonable difference of opinion" as to the materiality, summary judgment is appropriate. *Kivela,* 408 N.E.2d at 810. "A representation is material if the fact or facts represented reasonably enter into and influence the insured's decision whether to issue a policy or to charge a higher premium." *Id.* at 810. There can be no reasonable difference in opinion as to whether the failure to list the July 20, 1991 accident was material; it created an alleged loss of one million dollars. *See id.*

The appellants attempt to overcome these misrepresentations by claiming that no misrepresentation could have occurred because all facts known to Nash are imputed to Northern Assurance.

> While the knowledge of an agent is ordinarily to be imputed to the principal, it would appear now to be well established that there is an exception to the construction or imputation of notice from the agent to the principal in case of such conduct by the agent as raises a clear presumption that he would not communicate the fact in controversy, as where the communication of such a fact would necessarily prevent the consummation of a fraudulent scheme which the agent was engaged in perpetrating, or when the person claiming the benefit of the knowledge or notice or those

<hr />

4. Connie also failed to include her son William as either an "operator" or a "non-operator." Northern Assurance claims that this was also a misrepresentation. Apparently, Northern Assurance's position is that a person residing with an insured is either an operator (a person with a drivers license) or a non-operator (a person without a drivers license). The appellants dispute this categorization and claim that William was neither. Therefore, the appellants claim that Connie's failure to list William as an operator was not a misrepresentation. We need not determine the proper definition of "operator" and "non-operator," however, because the failure to include the July 20, 1991 accident as a "Accident, Conviction & Loss" sufficiently made the policy voidable.

whom he represents collude with the agent to cheat or defraud the principal.

*Vincennes Sav. & Loan Assoc. v. St. John,* 213 Ind. 171, 12 N.E.2d 127, 130 (Ind.1938) (citation omitted). We are hard-pressed to imagine a case in which it is more clear that an agent will not inform her principal of the facts: Nash met with Connie after hours in a parking lot to obtain an insurance application for an automobile which was involved in an accident two days earlier; the insurance application failed to mention that very same accident; Nash altered the date on the insurance binder; and Connie did not submit a claim for the accident until after she had submitted the application and until the same day that the policy was issued. Not only would the omitted information have prevented the contract, but the agent's complicity to deceive the principal also prevents us from imputing Nash's knowledge to Northern Assurance.

As a last resort, appellants argue that the insurance policy was conclusively in effect and not voidable because Nash filed a Certificate of Financial Responsibility with the Indiana Department of Motor Vehicles which stated that an automobile policy was in effect since July 15, 1991. We cannot accept the appellants' position. For Northern Assurance to be bound by Nash's actions in filing the Certificate, she must have had actual authority to do so. Even if Nash had authority to file Certificates of Insurance, such authority was logically limited to those situations in which insurance coverage actually existed. At the time that she filed the certificate, Nash knew that the policy had been issued based on a fraudulent application and she knew that Northern Assurance had reserved its rights under the policy. She also knew the insured auto was involved in an accident, thus defeating any policy of protecting third parties. She, therefore, did not have authority to file a certificate of insurance.

## III. Conclusion

Nash did not have actual or apparent authority to issue Connie the insurance binder on behalf of Northern Assurance. Therefore, no coverage for the July 20, 1991 accident existed under the binder. The insurance contract Northern Assurance issued was voidable because the exclusion of the July 20, 1991 accident constituted a material misrepresentation. Thus, coverage also did not exist under the insurance policy. Therefore, we affirm the district court's grant of summary judgment to Northern Assurance and denial of partial summary judgment to Connie, William and Summers. Because no insurance coverage exists, we also affirm the district court's finding for Northern Assurance on the appellants' breach of contract and bad faith counterclaims and the court's dismissal of Northern Assurance's counterclaim.